**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NORMAN H. GRAHAM AND RYAN W. GRAHAM, on behalf of themselves and all others similarly situated, | Civil Action No. 2:23-cv-69 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Norman H. Graham and Ryan W. Graham ("Plaintiffs") bring this action on behalf of themselves and on behalf of the Class defined herein against Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta"), and Corteva, Inc. ("Corteva") (collectively with Syngenta, "Defendants") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## I.   NATURE OF THE ACTION

1.      Farmers have been grappling with skyrocketing operating expenses for the last several years.  In a 2018 survey, 80% of farmers reported their costs were increasing and they were unable to pay their debts — estimated to be over $400 billion as of 2019.

2.      In the latest-revealed scheme to take advantage of farmers in the United States, Defendants have implemented special "loyalty programs" in connection with key active ingredients that are incorporated into products that farmers use to protect crops from damage caused by insects, weeds, and fungi ("pesticides").

3.      Under these loyalty programs, Defendants provide payments to distributors in exchange for selling certain amounts of Defendants' pesticides and restricting sales of generic pesticides made by competing manufacturers.  Defendants implement and enforce these loyalty programs to ensure that manufacturers of generic pesticides are unable to effectively distribute their products, which preserves Defendants' control of the market and prevents price competition.

4.      As reflected in a recent complaint filed by the Federal Trade Commission (the "FTC") and ten state Attorneys General, Defendants' scheme has succeeded.  In order to obtain Defendants' loyalty payments, distributors severely curtail sales of, and in some cases wholly refrain from selling, pesticides that compete with those manufactured by Defendants.  Without these distributors, competing manufacturers cannot effectively sell their pesticides, and farmers are forced to purchase Defendants' higher-priced products.  As a result, farmers face decreased innovation, fewer choices, and increased prices totaling many millions of dollars in overcharges.

5.      Farmers use pesticides to control pests that would otherwise harm their crops. Pesticides are crucial to crop management as they enable farmers to grow safe, healthy food and to increase crop quality and yield.  Each year, about 500 million kilograms (more than one billion pounds) of pesticides are used in the United States, costing approximately $10 billion per year.[1] Syngenta and Corteva are two of the largest pesticide manufacturers in the United States and globally.  In 2021, Syngenta's worldwide pesticide sales were approximately $13.5 billion.[2] Corteva's were $7.3 billion.[3]

---

[1]      Sharma, A., Kumar, V., Shahzad, B. et al., *Worldwide pesticide usage and its impacts on ecosystem.*, SN APPL. SCI. 1, 1446 (2019), https://doi.org/10.1007/s42452-019-1485-1.

[2]      Media Release, Syngenta Group, Syngenta Group reports 2021 performance, growing 23%, with $28.2 billion sales (2021), https://www.syngentagroup.com/sites/syngenta-group/files/media/syngenta-news/220331-syngenta-group-fyr-2021-en.pdf.

[3]      News Release 4Q 2021, Corteva agriscience, Corteva Delivers Strong Fourth Quarter and Full-Year 2021 Results Led by Broad-Based Execution, Provides 2022 Guidance (2022),

6.     The pesticide industry is regulated through a framework similar to that which currently governs the pharmaceutical industry through patent and safety requirements as well as certain exclusivity benefits.  Under Congress's patent and regulatory scheme, Defendants Syngenta and Corteva are "basic" manufacturers that initially develop, patent, and register the active ingredients that make pesticides effective.  Once approved, these basic manufacturers possess certain exclusive rights for a period of years.  Once the exclusivity period expires, generic manufacturers may enter the market with equivalent products containing the same active ingredients and relying upon the same toxicology and environmental impact data.  Competition from generic products leads to significant price reductions.

7.     Farmers benefit from reduced prices caused by the availability of generic pesticides.  Nevertheless, Defendants have designed and implemented "loyalty programs" to limit generic competition long after regulatory and patent exclusivity periods expire.

8.     On September 29, 2022, following an investigation, the FTC filed a complaint against Defendants alleging that Defendants' loyalty programs foreclose generic competition and result in higher prices for farmers in violation of federal and state antitrust laws.[4]

9.     As revealed by the FTC's investigation, Defendants' loyalty programs provide that Defendants will make payments in the form of "rebates" to distributors based on their purchases of Defendant-branded pesticides — but there is a condition: distributors and retailers must limit their purchases of generic pesticides to a set percentage.  Defendants both reward participation in their loyalty programs and punish non-compliance.  Indeed, Defendants ensure that distributors

---

https://investors.corteva.com/static-files/1d7c9b00-eefa-4938-b15f-b2277a5e4a68#:—:text=Crop%20Protection%2Onet%20sales%20were%20approximately%20%247.3%20billion%Ofor%20full,a%201%25%2Ounfavorable%2Oportfolio%20impact.

[4]     *FTC v. Syngenta Crop Protection AG*, Case No. 1:22-cv-00828 (M.D.N.C. Sept. 29, 2022), ECF No. 1 ("FTC Complaint").

3

profit more from accepting Defendants' "rebates" payments than they would from distributing a higher volume of lower-priced, generic pesticides.

10. Only a small number of distributors dominate the sale of pesticides in the United States. Because they profit from participating in Defendants' loyalty programs and face significant financial consequences if they do not, these distributors readily exclude generic pesticides from their distribution lists. As a result, generic competitors are almost entirely foreclosed from efficiently distributing their products. Prices remain high and farmers pay millions of dollars more than they otherwise would have for pesticides containing Defendants' ingredients. Defendants, on the other hand, are able to maintain high prices and dominant market positions years after their exclusivity expires. While Defendants and their distributors benefit, farmers are left to pay supracompetitive prices for pesticides and are deprived of access to cheaper generic alternatives.

11. As a result of Defendants' conduct, Defendants have restrained competition, maintained unlawful monopolies, and harmed America's farmers, reducing choices for these farmers and costing them millions of dollars in overcharges. Plaintiffs and the Class bring this antitrust suit under federal antitrust laws, state antitrust and consumer protections laws, and for unjust enrichment to redress that wrongful conduct.

## II. JURISDICTION AND VENUE

12. Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to secure injunctive relief and to recover actual and compensatory damages, treble damages, interest, costs, and attorneys' fees for the injury caused by Defendants' wrongful conduct against Defendants for violating the Sherman Act, 15 U.S.C. §§1 and 2. Plaintiffs also bring state law class claims on behalf of the Class to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct.

4

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.  This Court also has jurisdiction under 28 U.S.C. §1332 because the amount in controversy exceeds $5,000,000 and members of the Class are citizens of a different state than Defendants.

14.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15(a), 22, 26, and 28 U.S.C. §1391(b), (c), and (d).  One or more Defendants resided, transacted business, were found, had agents in, or engaged in substantial activity in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

15.     This Court also has personal jurisdiction over each Defendants because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pesticides throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

16.     The activities of Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

## III.    PARTIES

### A.    Plaintiffs

17.     Plaintiffs Norman H. Graham and Ryan W. Graham are residents of Butler County, Pennsylvania.   From approximately 2017 through 2022, Plaintiffs purchased herbicides and pesticides, manufactured by Defendants including SureStart II, Explorer 4x1 and Fultime NXT

which contain some or all of the active ingredients azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, or acetochlor. Plaintiffs purchased these products at supracompetitive prices as a result of Defendants' misconduct.

**B.    Defendants**

18.    Defendant Syngenta Crop Protection AG is headquartered in Basel, Switzerland and is organized and existing under the laws of Switzerland. Since in or about May 2021, Syngenta Crop Protection AG has been an indirect subsidiary of Sinochem Holdings Corporation Ltd., a chemical company based in Beijing, China. Syngenta Crop Protection AG's North American headquarters is located in its 70-acre campus in Greensboro, North Carolina. Syngenta Crop Protection AG transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of pesticides.

19.    Defendant Syngenta Corporation is a privately held subsidiary of Syngenta Crop Protection AG, which markets seeds and crop-protection products in the United States and is headquartered in Wilmington, Delaware. Syngenta Corporation is a corporation organized and existing under the laws of the State of Delaware. Syngenta Corporation transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of pesticides.

20.    Defendant Syngenta Crop Protection, LLC is a corporate affiliate of Syngenta Crop Protection AG and is headquartered at 410 S. Swing Road, Greensboro, North Carolina 27409. Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Syngenta Crop Protection, LLC transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of pesticides.

21.    Corteva, Inc. is a publicly held corporation headquartered at 9330 Zionsville Road, Indianapolis, Indiana 46268. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"). Corteva is a

6

corporation organized and existing under the laws of the State of Delaware. Substantially all of Corteva's revenue is derived from the sales of seeds and crop-protection products to farmers, distributors, and manufacturers, where it sold $4.382 billion in crop-protection products for the six months ending June 30, 2022. Corteva transacts or has transacted business in this District and is engaged in the development, manufacture, and sale of pesticides.

## IV. FACTUAL ALLEGATIONS

### A. The Pesticide Industry

22. The large majority of pesticides sold in the United States are sold to farmers and growers and used for crop protection. There are three main categories of pesticides: herbicides, insecticides, and fungicides. These products are used by farmers and growers to target unwanted plants or weeds, insects, and fungal diseases, respectively.

23. Pesticides contain at least one "active ingredient." The active ingredient is the chemical substance that kills or controls the targeted plant, animal, or fungal pest. Active ingredients can be sold as standalone active ingredients that can be mixed with inactive ingredients such as water, adjuvants, surfactants, or in some cases other active ingredients, prior to application, or as part of pre-mixed pesticides, that are formulated into finished pesticides ready to be applied to crops.

24. Active ingredients have unique features and uses such that it does not make sense for farmers to replace one active ingredient with another. Thus, a chemically equivalent generic pesticide with the same active ingredient as a branded product is a closer substitute for a given branded product than a branded product containing a different active ingredient. This is because active ingredients differ from each other in several ways, including their effectiveness, the crops for which they are suited, the stage of the growing cycle at which they can be used, and their performance in varying types of climates and weather. Active ingredients also each have a "mode

7

of action," the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest. Active ingredients with common modes of action have similar uses but differ in performance and other ways. Accordingly, active ingredients do not readily replace each other in a given application or condition.

25. Pesticide manufacturers create, market, and sell crop pesticides. They may synthesize the active ingredients for their fully formulated pesticides products on their own or purchase active ingredients from other manufacturers.

26. "Basic" manufacturers are those that research, develop, and patent new active ingredients. Syngenta and Corteva are basic manufacturers and among the largest manufacturers of pesticides in the United States and globally.

27. Generic manufacturers primarily sell pesticides containing active ingredients initially developed by basic manufacturers. To do so, they must wait for regulatory and patent exclusivity periods on the active ingredients to expire. More than a dozen generic manufacturers sell pesticides in the United States.

28. In general, pesticide manufacturers sell to distributors that sell to (and in many cases are integrated with) retail outlets across the United States. This is referred to as the "traditional distribution channel."

29. Selling through distributors is the most efficient way for a pesticide manufacturer to reach farmers for a variety of reasons. Distributors offer services such as warehousing, transportation, and credit and marketing, among others. They provide access to a network of customers, including farmer and retail customers dispersed throughout the country. And they provide scale and services that would require substantial investments if a manufacturer attempted to replicate the same services on its own. Even then, manufacturers lack the pre-existing

relationships that retailers maintain with farmers in their local region. Accordingly, a manufacturer cannot effectively compete without access to the traditional distribution channel.

30.     By selling to a relatively small number of distributors, the manufacturer can reach thousands of retailers, who can in turn reach hundreds of thousands of farmers with greater efficiency.

31.     In fact, upon information and belief, sales through this traditional distribution channel account for approximately 90% or more of all sales of pesticides in the United States. Just seven distributors, including Winfield Solutions, LLC and Univar Solutions, Incorporated, account for more than 90% of sales through the traditional channel, and therefore account for approximately 80% or more of all sales of pesticides to farmers in the United States.

### B.     Regulatory Framework

32.     Congress's patent and regulatory framework governing pesticides seeks to encourage innovation for the developers of new active ingredients, while simultaneously facilitating generic entry into the market and price competition after patents expire and exclusivity periods end.

33.     A basic manufacturer of a new active ingredient can apply for U.S. patent protection for a term beginning when the patent issues and expiring twenty years after the initial patent application.

34.     The basic manufacturer may also obtain certain exclusive rights under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). FIFRA requires submission, review, and approval by the United States Environmental Protection Agency ("EPA") of detailed toxicology and environmental impact data prior to the sale or distribution of any pesticide in the United States to ensure the products' safety.

9

35. Once the EPA approves a new active ingredient, the original manufacturer receives the exclusive right to cite the data it submitted in support of its active ingredient registration for ten years. Often, this ten-year exclusivity extends beyond the basic manufacturer's patent protection, bestowing twenty-plus years of exclusivity on the basic manufacturer.

36. After the basic manufacturer's exclusivity expires, a generic manufacturer of pesticides with a pesticide product containing the same active ingredient may enter the market. These products may be equivalent to the basic manufacturer's product ("branded product") or may combine the active ingredient with other ingredients to make new products. A generic entrant must apply to register its product for sale in the United States under FIFRA. However, FIFRA permits generic entrants to rely on the basic manufacturer's data. In turn, the basic manufacturer may be entitled to compensation payments for its data, depending on the generic entrant's reliance on the data.

37. Generic pesticides and active ingredients are usually sold at lower prices than the equivalent branded products manufactured by companies such as Syngenta and Corteva. As the generic manufacturers are able to enter the market and gain market share, price competition ensues causing the branded products' price and sales volume to decline.

38. When the brand manufacturers expect generic entry on a particular active ingredient, Defendants employ certain strategies intended to block generic entry at the end of patent exclusivity and minimize the impact on prices and market shares of their branded products.

C. **Defendants' Loyalty Programs**

39. Syngenta and Corteva, both basic manufacturers, have each benefited from long-lasting exclusivity rights as a result of Congress's framework. But, unwilling to relinquish the pricing and market-share benefits of exclusivity after exclusivity rights expire, both Defendants implemented loyalty programs through agreements with distributors who collectively make up the

10

majority of all pesticide sales in the United States. Each Defendant designs and administers its loyalty program with the purpose, intent, and expectation that the program will impede generic competition and thereby maintain market prices and branded market share at levels higher than would otherwise prevail in a competitive market. Each does so for its own benefit and for the benefit of its distributor partners.

40. Each Defendant's loyalty program is designed to retain market share while pricing its pesticide products above competitive levels. Each Defendant has substantially succeeded in impeding generic competition for its active ingredients.

41. Syngenta operates its loyalty program — called the "Key AI" program — with both distributors and retailers. It is implemented through written marketing agreements with participating distributors.

42. Like Syngenta's loyalty program, Corteva's loyalty program conditions payments to distributors on meeting certain loyalty thresholds for specified active ingredients. Upon information and belief, Corteva's loyalty programs are also implemented through written marketing agreements with participating distributors.

43. Through their respective loyalty programs, Defendants incentivize distributors to refuse to sell generic manufacturers' pesticides. This enables Defendants to increase market prices and maintain or increase their shares of pesticides relied on by farmers.

44. Defendants' loyalty programs are specifically designed to maintain supracompetitive prices and profits, which the Defendant manufacturers then share with their distributors and retail partners at the expense of farmers in return for the distributors and retail partners restricting access of generic manufacturers to the traditional distribution channel. The agreements require participating distributors and retailers to meet very high loyalty thresholds for

11

each active ingredient and to refrain from marketing significant volumes of competing, lower-priced generic products, in exchange for a share of the profits resulting from the scheme.

45.    Several features of the loyalty programs ensure their success.  Each Defendant enters loyalty-program agreements with substantially all leading distributors.  This fact is broadly known by all participants in the industry.  Because so many leading distributors participate, distributors are confident that no significant competing distributor will partner with a low-priced generic manufacturer and undercut them.

46.    Defendants also maintain their so-called "rebates" (in reality, exclusion payments meant to impede generic sales) at levels that ensure distributors will profit more from selling Defendants' branded products than they would from selling generic products, even at high volumes.

47.    Additionally, Defendants strictly enforce the terms of the loyalty programs and penalize distributors who do not meet loyalty thresholds.  In some instances, the consequences of missing a loyalty threshold can be so severe that distributors have declined to purchase or promote generic products at all, have endeavored to exceed loyalty thresholds, and have deferred purchases of generic products until the end of the season, in order to minimize the risk of inadvertently missing a loyalty threshold.

48.    Recognizing that Defendants' loyalty programs effectively block generic manufacturers' access to the pesticide market, generic manufacturers have avoided investing resources necessary to manufacture pesticides with active ingredients developed by Defendants even after the patent exclusivity period for these active ingredients expired.  As a result, Defendants have maintained monopolies in the market for key active ingredients used in pesticides widely relied on by farmers.

## D.    Relevant Products and Markets

49.    Defendants have successfully achieved their goals of retaining their market shares while pricing their pesticides at supracompetitive levels.

50.    Syngenta's loyalty program applies to at least three active ingredients that are threatened by generic competition: azoxystrobin, mesotrione, and metolachlor (together with Corteva active ingredients, the relevant Syngenta and Corteva products are referred to herein as "Relevant AIs").

- *Azoxystrobin*.  Azoxystrobin is a fungicide used to protect a wide variety of crops from fungal diseases.  Upon information and belief, it has annual global sales of over $1 billion.  Sales of pesticides containing azoxystrobin in the United States totaled in the millions in 2020 alone.  Azoxystrobin was initially developed, patented, and registered with the EPA by a Syngenta predecessor company.  Upon information and belief, Syngenta's exclusive-use period under FIFRA and its relevant patent protection has expired.  According to the FTC, "[a]t least one other generic manufacturer decided against introducing an azoxystrobin product because of the lack of market access due to Syngenta's loyalty program."[5]

- *Mesotrione*.  Mesotrione is a widely used corn herbicide.  Sales of pesticides containing mesotrione in the United States totaled in the millions in 2020.  Mesotrione was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates).  Syngenta's relevant exclusive-use period under the FIFRA and patent protection has expired.  According to the FTC, at least "[t]wo generic manufacturers delayed or terminated their planned mesotrione entry due to loyalty-program concerns."[6]

- *Metolachlor*.  Metolachlor (which refers to the original active ingredient and the later-registered s-metolachlor variant) is an herbicide used on a wide variety of crops, including corn, soybeans, grain sorghum, cotton, potatoes and many others.  Sales of pesticides containing metolachlor in the United States totaled in the millions in 2020.  The original metolachlor compound was developed, patented, and registered with the EPA by a Syngenta predecessor company in or about 1976, and Syngenta's relevant patent protection for that compound expired in or about 1996.  A Syngenta predecessor company also developed, patented, and registered a variant

---

[5]    *Federal Trade Commission v. Syngenta Crop Protection AG*, No. 1:22-cv-00828 (M.D.N.C. 9/29/2022), ¶90, https://www.docketalarm.com/cases/North_Carolina_Middle_District_Court/1--22-cv-00828/FEDERALTRADECOMMISSIONetalv.SYNGENTACROPPROTECTIONAGeta1/1/.

[6]    *Id.*, ¶99.

of the original metolachlor, known as s-metolachlor. Syngenta's relevant patent protection and the FIFRA exclusive-use period for s-metolachlor has expired. According to the FTC, "[g]eneric manufacturers introduced products containing original metolachlor in or about 2003, [but] were unable to achieve significant market success. Other generic manufacturers delayed or canceled introduction of metolachlor products as a result of Syngenta's loyalty program." Subsequent generic manufacturers of pesticides containing s-metolachlor have also been marginalized by Syngenta's loyalty program.[7]

51.    Under its loyalty programs, Syngenta has made payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic azoxystrobin, mesotrione, and metolachlor products.

52.    Syngenta's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of azoxystrobin, mesotrione, and metolachlor products.

53.    To meet the threshold required under Syngenta's loyalty program, distributors strictly manage and allocate their generic azoxystrobin, mesotrione, and metolachlor open space under the loyalty program and steer their customers toward loyalty-compliant azoxystrobin, mesotrione, and metolachlor products. The loyalty programs prevent distributors from purchasing available, sufficient supplies of generic products in spite of customer demand for lower-priced generic products that exceeds the available open space.

54.    As a result, Syngenta's prices remain significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for pesticides containing azoxystrobin, mesotrione, and metolachlor than would prevail in a competitive market.

55.    Corteva's loyalty program applies to at least three active ingredients: rimsulfuron, oxamyl, and acetochlor.

- **_Rimsulfuron_**. Rimsulfuron is an herbicide used on crops such as fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes. Sales of pesticides containing rimsulfuron in the United States totaled in the millions in 2020. Rimsulfuron was

---

[7]    _Id._, ¶111.

14

originally developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection has expired for rimsulfuron and the exclusive-use period under FIFRA expired by 2007, ten years prior to the 2017 Dow-DuPont merger that led to the formation of Corteva.

- *Oxamyl*. Oxamyl is an insecticide and nematicide used primarily on cotton and potatoes, as well as apples, citrus fruits and many other fruit and vegetable crops. Sales of pesticides containing oxamyl in the United States totaled in the millions in 2020. Oxamyl was initially developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection for oxamyl has expired and the exclusive-use period under FIFRA expired no later than 1987. A Corteva plant outage between 2015 and 2017 interrupted the supply of oxamyl products from Corteva. In response to the outage, the first generic oxamyl manufacturer entered the market in or about the fall of 2017. Other generic manufacturers followed in or about 2018. Generic entrants were at first relatively successful, but after Corteva placed oxamyl in its loyalty program, distributors curtailed their purchases of generic oxamyl.

- *Acetochlor*. Acetochlor is an herbicide that is used predominantly on corn, but also is used on cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane. Sales of pesticides containing acetochlor in the United States totaled in the millions in 2020. The EPA granted registration for acetochlor in 1994 to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers. The ARP continues to hold the U.S. registration for acetochlor; its current partners are Corteva and Bayer. Bayer manufactures acetochlor for both parties. The patent exclusivity period for Acetochlor expired, as well as the exclusive-use period under FIFRA. Since the first generic acetochlor sales in or about 2018, generic manufacturers have made little headway with distributors.

56. Under its loyalty programs, Corteva has made payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic rimsulfuron, oxamyl, and acetochlor products.

57. Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of rimsulfuron, oxamyl, and acetochlor products.

58. To meet the terms of Corteva's loyalty program, distributors strictly manage and allocate their generic rimsulfuron, oxamyl, and acetochlor open space under the loyalty program and steer their customers toward loyalty-compliant rimsulfuron, oxamyl, and acetochlor products. For example, some distributors have removed generic pesticides containing rimsulfuron from their

15

product lists completely. Loyalty-program constraints have also caused distributors to refrain from purchasing more than minimal amounts of generic oxamyl (or in some cases, any at all) and loyalty-program constraints have prevented distributors from purchasing more than minimal amounts of generic acetochlor (or in some cases, any at all) despite generic products being of sufficient quality and supply availability.

59. As a result, Corteva's prices remain significantly above competitive levels. Corteva's loyalty program has resulted in higher prices for pesticides containing rimsulfuron, oxamyl, and acetochlor than would prevail in a competitive market.

### E. Defendants' Monopoly Power

60. At all times during the Relevant Period, Syngenta has had monopoly and market power with respect to azoxystrobin, mesotrione, metolachlor, and with respect to pesticides containing those Relevant AIs.

61. At all times during the Relevant Period, Corteva has had monopoly and market power with respect to rimsulfuron, oxamyl, and acetochlor and with respect to pesticides containing those Relevant AIs.

62. Evidence of each Defendant's monopoly and market power includes each Defendant's ability to price Relevant AIs and pesticides containing those Relevant AIs above competitive levels, and to exclude competition from generic manufacturers through operation of its loyalty program. Each Defendant's monopoly and market power is also shown through dominant or substantial market shares in relevant markets with substantial barriers to entry.

63. Each relevant market is defined by reference to a Relevant AI. For each of azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, and acetochlor:

(a) A relevant product market exists that is no broader than the active ingredient, consisting of: (1) the active ingredient included as a component of an

16

EPA-registered finished pesticide for sale in the United States, and (2) technical-grade or manufacturing-use active ingredient to be formulated into an EPA-registered pesticide for sale in the United States; and

(b)     A relevant product market(s) also exists that is no broader than EPA-registered pesticides for sale in the United States that contain the active ingredient. These markets are referred to herein as the "Relevant Markets."

64.     For each Relevant AI, absent the restraint imposed by Defendants' loyalty programs, unrestrained competition from generic manufacturers would have a significant and non-transitory downward effect on prices in the Relevant Markets.

65.     Each Relevant AI has particular characteristics and uses that differentiate it from other active ingredients.

- *Azoxystrobin*.  Azoxystrobin can be used across all major row crops, which simplifies pesticide management.  Syngenta also claims that azoxystrobin has growth-enhancing effects not proven in other active ingredients.

- *Mesotrione*.  Compared to other, similar herbicide active ingredients, mesotrione has superior efficacy and crop safety, and a low use rate.

- *Metolachlor*.  Compared to other, similar herbicide active ingredients, metolachlor has superior water solubility, and therefore tends to perform better in dry conditions. Metolachlor also outperforms other active ingredients in warmer conditions, is more "crop friendly," and can be used on a broader spectrum of crops.

- *Rimsulfuron*.  Compared to other, similar herbicide active ingredients, rimsulfuron can be used on a broader range of crops, controls a wider spectrum of weeds, can be used both pre- and post-emergence, and has more application methods, no dormancy restrictions, and a lower use rate.  Further, rimsulfuron is inexpensive to produce compared to other, similar herbicide active ingredients.

- *Oxamyl*.  Oxamyl products can be sprayed directly onto crops, whereas other, similar insecticide active ingredients must be applied at the root level or mixed into the soil.  Oxamyl is also safer for crops and better for soil health than other, similar insecticide active ingredients.

- *Acetochlor*.  Compared to other similar, herbicide active ingredients, acetochlor tends to perform better in wetter and cooler conditions.  Acetochlor also tends to

17

have better weed control early in the growing season and is more effective against certain weed species.

66. Given these idiosyncratic characteristics, for each Relevant AI, other active ingredients are not substitutable to prevent Syngenta or Corteva from maintaining prices of pesticides containing the Relevant AI above competitive levels.

67. The relevant geographic market as to all products is the United States. Pesticides are largely sold and regulated on a nationwide basis. Because the EPA must approve and register all pesticides prior to sale or distribution in the United States, United States farmers may not lawfully use pesticides manufactured and labeled for use outside the United States.

68. There are substantial barriers to entry into each Relevant Market. Potential generic manufacturers face significant capital, technical, regulatory, and legal barriers, including obtaining registration from the EPA, developing manufacturing processes and sourcing the active ingredient, and paying data compensation costs to the basic manufacturer.

69. Syngenta's and Corteva's loyalty programs also impose a substantial barrier to entry by limiting generic manufacturers' access to the traditional distribution channel, among other things.

70. Upon information and belief, Syngenta has maintained dominant shares of the U.S. Relevant Markets for azoxystrobin, mesotrione, and metolachlor each year from at least 2017 through at least 2020.

71. Upon information and belief, Corteva has maintained dominant shares of the U.S. Relevant Markets for rimsulfuron and oxamyl each year from at least 2017 through at least 2020.

72. Upon information and belief, Corteva has maintained a substantial share of the U.S. Relevant Market for acetochlor each year from at least 2017 through at least 2020. Upon information and belief, Bayer imposes limited constraints on Corteva's pricing of acetochlor products compared to generic manufacturers, and Bayer's presence in the market has not prevented Corteva from maintaining prices of pesticides containing acetochlor above competitive levels.

73. For each Relevant AI, absent the restraints imposed by Syngenta's or Corteva's loyalty programs, generic pesticide manufacturers would have been able to effectively compete with Defendants and prices would have been lower.

**F. Harm to Competition and Consumers**

74. Each Defendant's loyalty programs and other anticompetitive conduct in conjunction with the loyalty programs has harmed competition by substantially foreclosing generic competition in the Relevant Markets, thereby lessening competition; raising prices; reducing innovation; lessening choice; causing generic competitors to exit or abandon plans to enter the Relevant Markets; and/or tending to create or maintain monopolies in the Relevant Markets. Defendants' loyalty programs have also harmed consumers — farmers — by causing higher prices, reduced innovation, and reduced choice for farmers in the Relevant Markets.

75. Each Defendant's anticompetitive conduct is not reasonably necessary to achieve any cognizable procompetitive benefits. The anticompetitive harm from their conduct outweighs any procompetitive benefits, and each Defendant could reasonably achieve any procompetitive goals through less restrictive alternatives.

76. Each Defendant's unlawful conduct is ongoing. Upon information and belief, each Defendant continues to operate its loyalty program, including by enforcing loyalty thresholds and making payments to distributors and retailers for meeting these thresholds and thus excluding

generic competition. Absent injunctive relief ordered by this Court, each Defendant is likely to continue to harm competition and the public interest.

### G. Foreclosure of Competition

77. Defendants have harmed competition by foreclosing actual or potential competitors from access to distribution services, or by foreclosing actual or potential competitors from access to efficient distribution channels.

78. The most efficient channel of distribution for each Relevant Market is through those distributors used by Defendants and controlled through the incentives of the loyalty programs. Each Defendant's loyalty program has almost entirely foreclosed generic manufacturers from access to the traditional distribution channel. With respect to each Relevant Market, this exclusion of generic competitors from the traditional channel has harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient, cost-effective distribution, and in some circumstance *any* distribution.

79. By excluding generic competitors from the traditional distribution channel, each Defendant's loyalty program has foreclosed a substantial share of each applicable Relevant Market to generic competition. This is because a high percentage of all pesticide sales are made through the traditional channel (over 90%) and a high proportion of the traditional channel participates in Defendants' loyalty programs. Thus, each Defendant's loyalty programs have effectively foreclosed generic competitors from competing for a large portion of each applicable Relevant Market.

80. The market foreclosure created by Defendants' loyalty programs has been of substantial duration. Generic manufacturers of pesticides containing the applicable Relevant AIs have been substantially foreclosed from the Relevant Markets for five years or more, including since at least 2017.

81. Defendants' loyalty programs have further foreclosed competition by offering and providing payments to distributors even when distributors do not agree or otherwise commit, in advance, to meet the relevant targets that the Defendants include in their loyalty programs. The prospect of receiving a payment from Defendants — as well as profits from the higher prices caused by the market-wide exclusion of generics — has effectively induced distributors to limit or forgo purchases from lower-priced competitors that offer or would offer generic pesticides containing the Relevant AIs.

82. Distributors adhere to Defendants' loyalty-program thresholds in significant part due to the prospect of receiving substantial payments under the programs. In addition, structural features of each Defendant's loyalty program promote adherence, as well as strict enforcement efforts.

83. Distributors' incentive to comply with loyalty-program thresholds is further enhanced by the fact that substantially all major distributors participate in the programs. Distributors profit more when prices to retailers and farmers are higher, and the distributors' collective participation in the loyalty programs has the effect of maintaining higher prices to farmers.

84. Distributors are further incentivized to comply with the loyalty programs by their knowledge that all of their distributor-competitors are participating, and no one is going to break ranks and lower the prices and profits that they all enjoy under the scheme or compete for market share.

85. Together with Defendants' strict enforcement efforts, these features of Defendants' loyalty programs incentivize distributors to meet applicable loyalty thresholds by forgoing or severely limiting purchases from generic manufacturers.

86. Upon information and belief, Defendants also discourage distributors from passing on payments made pursuant to loyalty programs to farmers. This has the effect of maintaining artificially high prices for pesticides manufactured by Defendants in the Relevant Markets.

87. The loyalty program's complexity, lack of transparency to farmers and generic manufacturers harmed by the conduct, and deferred payment timing cause distributors to retain loyalty program payments as profit and make them less likely to pass on loyalty-program payments to farmers in the form of lower prices. The terms of loyalty programs are confidential and are not accessible by farmers or manufacturers of generic pesticides.

88. As a result of Syngenta's and Corteva's respective loyalty programs, distributors have severely limited their purchase, promotion, and sale of generic pesticides containing each Relevant AI. To meet applicable loyalty thresholds, distributors have omitted generic products from their product lists, refused customer requests for generics, declined generic companies' offers to sell pesticides, and steered retailers and farmers toward branded products.

89. As a result of Syngenta's and Corteva's respective loyalty programs, distributors have declined to buy more than minimal amounts of pesticides containing each applicable Relevant AI from generic manufacturers despite sufficient demand, availability, and quality of generic products.

90. With respect to each Relevant AI, in the absence of the applicable Syngenta or Corteva loyalty program, generic manufacturers would make significantly more sales to distributors, which would enable them to realize distribution efficiencies and scale benefits. These benefits would increase price competition, innovation, and choice in Relevant Markets, which in turn would benefit American farmers.

91.     In the absence of Defendants' respective loyalty programs, sales of generic pesticides containing Relevant AIs would be significantly higher and would exceed the limits dictated by the loyalty programs.  American farmers would benefit from having an increased amount of lower-price generic products available in Relevant Markets.

92.     In contrast to the Relevant AIs, when selling products containing active ingredients that are not subject to the loyalty programs, generic manufacturers are able to make all or nearly all of their sales through traditional distribution channels.

93.     In the applicable Relevant Markets (azoxystrobin, mesotrione, and metolachlor), Syngenta has added an additional layer of foreclosure to that created by its distributor loyalty program through its retail loyalty program.  As with the distributor program, the retail program has substantially foreclosed generic manufacturers from efficient distribution of their products, given the participation of leading retailers in the program.

94.     Each Defendant's so-called "loyalty program" has prevented, delayed, and diminished entry and expansion by generic manufacturers of pesticides containing applicable Relevant AIs, and caused generic pesticide manufacturers to exit the market for products containing Relevant AIs, even when generic manufacturers can otherwise satisfy regulatory conditions and overcome other barriers to entry.

95.     Multiple generic manufacturers have concluded that entry into the market is not economically feasible due to the artificial constraints created by applicable Syngenta or Corteva loyalty programs.

96.     In some cases, Syngenta's or Corteva's loyalty programs have caused foreclosure of sales opportunities that have led a generic manufacturer already competing in a Relevant Market not to re-register its product, or to stop offering a product containing the Relevant AI.

97.     In the absence of Defendants' respective loyalty programs, generic manufacturers would compete more effectively and compete for more sales in each Relevant Market.

98.     Each Defendant's so-called "loyalty program" has reduced the ability and incentive of generic manufacturers to bring new differentiated pesticides containing applicable Relevant AIs to market, harming innovation and restricting farmer choice.

99.     Generic manufacturers often create new active-ingredient mixtures or other new offerings that meet farmer needs.  Generic manufacturers also often innovate on the non-active-ingredient components of pesticides in ways that are beneficial to farmers.

100.    Because of the barriers to entry created by Syngenta's and Corteva's respective loyalty programs, generic manufacturers have in several instances abandoned attempts to develop innovative products containing applicable Relevant AIs.  For the same reason, when determining whether to bring to market an innovative product, such as a new mixture, generic manufacturers have sought to avoid using active ingredients that are subject to either Defendant's loyalty program.

101.    In the absence of Defendants' respective loyalty programs, there would be more innovative products from generic manufacturers in the applicable Relevant Markets, leading to more farmer choice.

102.    Each Defendant's so-called "loyalty program" has resulted in higher prices to farmers for pesticides containing Relevant AIs than would prevail in competitive markets.  Each Defendant's anticompetitive conduct has thwarted the downward pressure that generic manufacturers' entry and expansion with access to efficient distribution would otherwise impose on prices in markets for pesticides containing Relevant AIs.

103.     Generic pesticides are generally priced lower than branded equivalents, and as to each Relevant AI, farmers pay more for pesticides containing the active ingredient because the applicable loyalty program artificially limits the availability of lower-priced generic alternatives. In many cases, farmers buy the more expensive, branded product because that is what is available and/or what is promoted by the traditional distribution channel, and not because that is what they prefer.  Defendants' loyalty programs thus result in unmet and unrealized demand for lower-priced equivalent generic products.

104.     When generic manufacturers are able to access the market for an active ingredient, they put downward pressure on the prices of branded products containing that active ingredient, and they exert more pressure the more access they achieve.  This downward pressure affects not only lower-end brands for which generics have exact substitutes upon entry, but all products containing the active ingredient, including higher end mixture products.  Defendants' loyalty programs, however, inhibit generic manufacturers' ability to access relevant markets and thus limit downward pricing pressure from generic competition.

105.     Even where generic manufacturers enter and sell at low prices to distributors, Defendants' loyalty programs result in higher prices to farmers by limiting the amount of available generic product.  This in turn enables distributors or retailers to price generic products just under branded products and to maintain branded prices, thus preventing the full benefits of generic price competition from flowing to farmers.

106.     In countries where pesticide loyalty programs do not exist, generic manufacturers have been able to compete more effectively, and farmers pay correspondingly lower prices.

107.     Even where generic manufacturers have been able over time to enter a given Relevant Market and have provided some measure of price competition, Defendants' loyalty

programs have limited the effects of this competition. Defendants' respective price responses, and responses of prices more generally in the applicable Relevant Market, have been less significant, and slower, than they would have been absent operation of the applicable loyalty program.

## V.  CLASS ACTION ALLEGATIONS

108.  Plaintiffs bring this action on themselves and as a class action under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of members of the following Class:

> All persons or entities who, since January 1, 2017, and continuing through the present (the "Class Period"), purchased pesticides in the United States and its territories containing the active ingredients azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, or acetochlor.

109.  Excluded from the Class are Defendants; their officers, directors, management, employees, parents, subsidiaries, affiliates, and coconspirators; and any persons or entities that purchased pesticides solely for resale to others. Also excluded are any federal, state, or local governmental entities and their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions, any judicial officers presiding over this action; their law clerks and spouses; any persons within three degrees of relationship to those living in the judicial officers' household; and the spouses of all such persons.

110.  Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in Defendants' possession.

111.  Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

112.  Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of members of the Class.

26

113. Plaintiffs are represented by counsel who are experienced in the prosecution and leadership of class action antitrust and other complex litigation.

114. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

(a) Whether Defendants conspired to unreasonably restrain trade in violation of federal antitrust laws;

(b) Whether Defendants conspired to unreasonably restrain trade in violation of state unfair competition and antitrust laws;

(c) Whether Defendants unlawfully monopolized the relevant markets;

(d) The scope and duration of the alleged conspiracy;

(e) Injury suffered by Plaintiffs and members of the Class;

(f) Damages suffered by Plaintiffs and members of the Class; and

(g) Whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

115. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

116.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

117.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

118.    Plaintiffs have defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

119.    Any applicable statute of limitations for Plaintiffs and the Class has been tolled with respect to any claims and rights of action that Plaintiffs and the Class have as a result of the unlawful combination and conspiracy alleged in this Complaint.   Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' concealment of the conspiracy.

120.    Plaintiffs and the Class were not placed on actual or constructive notice of the conspiracy alleged herein until, at the earliest, the FTC filed its complaint on September 29, 2022. Specifically, the FTC's complaint set forth the findings of its ongoing investigation into the Defendants and made public allegations that Defendants' loyalty programs restrained competition and caused higher prices, among other harms.   Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the Class.

121.    Defendants maintain and enforce strict confidentiality provisions in agreements with distributors that describe loyalty programs.   Distributors' contracts also contain strict

confidentiality provisions, prohibiting the disclosures of prices retailers pay to wholesalers for pesticides.

122.     Accordingly, Plaintiffs and the Class have virtually no visibility into Defendants' loyalty programs, let alone a conspiracy to use the loyalty programs to restrain trade and maintain supracompetitive pesticide prices.

**COUNT I**
**VIOLATION OF THE SHERMAN ACT**
**Conspiracy to Restrain Trade**
**in Violation of §1 of the Sherman Act (15 U.S.C. §1)**

123.     Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

124.     Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2017 (further investigation and discovery may reveal an earlier date), and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and distributors entered into a continuing agreement, understanding, and conspiracy, either express or tacit, in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for pesticides containing the Relevant AIs in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

125.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and distributors did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: engaged in a combination or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for pesticides containing the Relevant AIs principally but not exclusively, by designing and enforcing loyalty programs that prevented and continue to prevent competing generic manufacturers from entering the market and/or efficiently distributing their products.

126.    This conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

127.    Alternatively, this conspiracy is a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act.  There is no legitimate business justification for, or pro-competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof.  Any proffered business justification or asserted pro-competitive benefits would be pre-textual, outweighed by the anticompetitive effects of Defendants' conduct, and in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

128.    Plaintiffs and members of the Class directly purchased pesticides containing the Relevant AIs from Defendants' co-conspirators, including distributors that participate in Defendants' loyalty programs, at supracompetitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

129.    Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

130.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

131.    Plaintiffs and members of the Class are entitled to recover damages for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II
## VIOLATION OF THE SHERMAN ACT

**Monopolization in Violation of §2**
**of the Sherman Act (15 U.S.C. §2)**

132.     Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

133.     At all times relevant to assessing its conduct, Syngenta has had monopoly power in Relevant Markets for azoxystrobin, metolachlor, and mesotrione.  At all times relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets for rimsulfuron and oxamyl.

134.     Each Defendant has maintained its monopoly power through a course of anticompetitive and exclusionary conduct—primarily, but not exclusively, by entering and maintaining agreements with distributors and retailers that contain loyalty requirements and enforcing and threatening enforcement of loyalty requirements or otherwise threatening penalties — in violation of Section 2 of the Sherman Act, 15 U.S.C.

135.     Plaintiffs and members of the Class are entitled to recover damages for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT III**
**VIOLATIONS OF STATE ANTITRUST LAWS**
**(in the alternative to Sherman Act claims)**

136.     Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

137.     Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2017 (further investigation and discovery may reveal an earlier date), and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and distributors entered into a continuing agreement, understanding, and conspiracy, in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for pesticides containing the Relevant AIs in the United States

31

and have maintained their monopoly power through a course of anticompetitive and exclusionary conduct.

138.    Defendants' conduct has caused unreasonable restraints in the Relevant Markets.

139.    As a result of Defendants' unlawful conduct, Plaintiffs and other purchasers have been harmed by, among other things, paying inflated prices for pesticides containing the Relevant AIs in each of the Indirect Purchaser States.

140.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§44-1403, *et seq.*, with respect to purchases in Arizona by Class members and/or by Arizona residents;

(b)    Cal. Bus. Code §§16700, *et seq.*, and Cal. Bus. Code §§17200, *et seq.*, with respect to purchases in California by Class members and/or purchases by California residents;

(c)    Conn. Gen. Stat. §35-24, *et seq.*, with respect to purchases in Connecticut by Class members and/or purchases by Connecticut residents;

(d)    D.C. Code §§28-4503, *et seq.*, with respect to purchases in District of Columbia by Class members and/or purchases by District of Columbia residents;

(e)    Fla. Stat. §§501.201, *et seq.*, with respect to purchases in Florida by Class members and/or purchases by Florida residents;

(f)    Haw. Rev. Stat. §480, *et seq.*, with respect to purchases in Hawaii by Class members and/or purchases by Hawaii residents;

(g)    740 Ill. Comp. Stat. Ann. 10/3, *et seq.*, with respect to purchases in Illinois by Class members and/or purchases by Illinois residents;

(h)    Iowa Code §§553, *et seq.*, with respect to purchases in Iowa by Class members and/or purchases by Iowa residents;

(i)    Kan. Stat. Ann. §§50-101, *et seq.*, with respect to purchases in Kansas by Class members and/or purchases by Kansas residents;

(j)     Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by Class members and/or purchases by Massachusetts residents;

(k)     Me. Rev. Stat. Ann. 10, §§1102, *et seq.*, with respect to purchases in Maine by Class members and/or purchases by Maine residents;

(l)     Md. Com. Law Code Ann. §11-204(a), *et seq.*, with respect to purchases in Maryland by Class members and/or purchases by Maryland residents;

(m)     Mich. Comp. Laws Ann. §§445.773, *et seq.*, with respect to purchases in Michigan by Class members and/or purchases by Michigan residents;

(n)     Minn. Stat. §§325D.52, *et seq.*, with respect to purchases in Minnesota by Class members and/or purchases by Minnesota residents;

(o)     Miss. Code Ann. §§75-21-3, *et seq.*, with respect to purchases in Mississippi by Class members and/or purchases by Mississippi residents;

(p)     Mo. Rev. Stat. §§416.011, *et seq.*, with respect to purchases in Missouri by Class members and/or purchases by Missouri residents;

(q)     N.H. Rev. Stat. Ann. §§356.2, *et seq.*, with respect to purchases in New Hampshire by Class members and/or purchases by New Hampshire residents;

(r)     Neb. Code Ann. §§59-802, *et seq.*, with respect to purchases in Nebraska by Class members and/or purchases by Nebraska residents;

(s)     Nev. Rev. Stat. Ann. §§598A, *et seq.*, with respect to purchases in Nevada by Class members and/or purchases by Nevada residents;

(t)     N.M. Stat. Ann. §§57-1-2, *et seq.*, with respect to purchases in New Mexico by Class members and/or purchases by New Mexico residents;

(u)     N.Y. Gen. Bus. L. §§340, *et seq.*, with respect to purchases in New York by Class members and/or purchases by New York residents;

(v)     N.C. Gen. Stat. §§75-2.1, *et seq.*, with respect to purchases in North Carolina by Class members and/or purchases by North Carolina residents;

33

(w)     N.D. Cent. Code §§51-08.1-03, *et seq.*, with respect to purchases in North Dakota by Class members and/or purchases by North Dakota residents;

(x)     Or. Rev. Stat. §§646.705, *et seq.*, with respect to purchases in Oregon by Class members and/or purchases by Oregon residents;

(y)     10 L.P.R.A. §§260, *et seq.*, with respect to purchases in Puerto Rico by Class members and/or purchases by Puerto Rico residents;

(z)     R.I. Gen. Laws §§ 6-36, *et seq.*, with respect to purchases in Rhode Island by Class members and/or purchases by Rhode Island residents;

(aa)     S.D. Codified Laws Ann. §§37-1, *et seq.*, with respect to purchases in South Dakota by Class members and/or purchases by South Dakota residents;

(bb)     Tenn. Code Ann. §§47-25-101, *et seq.*, with respect to purchases in Tennessee by Class members and/or purchases by Tennessee residents;

(cc)     Utah Code Ann. §§76-10-3101, *et seq.*, with respect to purchases in Utah by Class members and/or purchases by Utah residents;

(dd)     Vt. Stat. Ann. 9, §§2453, *et seq.*, with respect to purchases in Vermont by Class members and/or purchases by Vermont residents;

(ee)     W.Va. Code §§47-18-4, *et seq.*, with respect to purchases in West Virginia by Class members and/or purchases by West Virginia residents; and

(ff)     Wis. Stat. §§133.03, *et seq.*, with respect to purchases in Wisconsin by Class members and/or purchases by Wisconsin residents.

141.     Plaintiffs and the Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

## <u>COUNT IV</u>
## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

142.     Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

34

143.     Beginning at least in 2017, Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in the states pleaded below.

144.     As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and the Class Members have been harmed by, among other things, paying inflated prices for pesticides containing the Relevant AIs in each of the Indirect Purchaser States.

145.     By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

(a)     Ark. Code §§4-88-101, *et seq.*, with respect to purchases in Arkansas by Class members and/or purchases by Arkansas residents;

(b)     Colo. Rev. Stat §6-1-105, *et seq.*, with respect to purchases in Colorado by Class members and/or purchases by Colorado residents;

(c)     Cal. Bus. and Prof. Code §§17200, *et seq.*, with respect to purchases in California by Class members and/or purchases by California residents;

(d)     D.C. Code §§28-3901, *et seq.*, with respect to purchases in the District of Columbia by Class members and/or purchases by District of Columbia residents;

(e)     Fla. Stat. §§501.201, *et seq.*, with respect to purchases in Florida by Class members and/or purchases by Florida residents;

(f)     Idaho Code §§48-601, *et seq.*, with respect to purchases in Idaho by Class members and/or purchases by Idaho residents;

(g)     815 ILCS §§505/1, *et seq.*, with respect to purchases in Illinois by Class members and/or purchases by Illinois residents;

(h)     Ind. Code §§24-5-0.5-1, *et seq.*, with respect to purchases in Indiana by Class members and/or purchases by Indiana residents;

(i)     Kan. Stat. §§50-623, *et seq.*, with respect to purchases in Kansas by Class members and/or purchases by Kansas residents;

35

(j)     Mass. Gen. Laws, ch. 93A, §2, with respect to purchases in Massachusetts by Class members and/or purchases by Massachusetts residents;

(k)     Minn. Stat. §§325F.68, *et seq.*, and Minn. Stat. §8.31, *et seq.*, with respect to purchases in Minnesota by Class members and/or purchases by Minnesota residents;

(l)     5 Me. Rev. Stat. §§207, *et seq.*, with respect to purchases in Maine by Class members and/or purchases by Maine residents;

(m)    Mo. Stat. §§407.010, *et seq.*, with respect to purchases in Missouri by Class members and/or purchases by Missouri residents;

(n)     Neb. Rev. Stat. §§59-1601, *et seq.*, with respect to purchases in Nebraska by Class members and/or purchases by Nebraska residents;

(o)     N.C. Gen. Stat. §§75-1.1, *et seq.*, with respect to purchases in North Carolina by Class members and/or purchases by North Carolina residents;

(p)     N.D. Cent. Code §51-15-01, *et seq.*, with respect to purchases in North Dakota by Class members and/or purchases by North Dakota residents;

(q)     N.M. Stat. §§57-12-1, *et seq.*, with respect to purchases in New Mexico by Class members and/or purchases by New Mexico residents;

(r)     Nev. Rev. Stat. §§598.0903, *et seq.*, with respect to purchases in Nevada by Class members and/or purchases by Nevada residents;

(s)     N.H. Rev. Stat. §§358-A:1, *et seq.*, with respect to purchases in New Hampshire by Class members and/or purchases by New Hampshire residents;

(t)     N.Y. Gen. Bus. Law §§349, *et seq.*, with respect to purchases in New York by Class members and/or purchases by New York residents;

(u)     Or. Rev. Stat. §§646.605, *et seq.*, with respect to purchases in Oregon by Class members and/or purchases by Oregon residents;

(v)     73 Pa. Stat. Ann. §§201-1, *et seq.*, with respect to purchases in Pennsylvania by Class members and/or purchases by Pennsylvania residents;

36

(w)    10 L.P.R.A. §260, *et seq.*, with respect to purchases in Puerto Rico Class members and/or purchases by Puerto Rico residents;

(x)    S.C. Code Ann. §39-5-140(a), *et seq.*, with respect to purchases in South Carolina by Class members and/or purchases by South Carolina residents;

(y)    Tenn. Code §§47-18-101, *et seq.*, with respect to purchases in Tennessee by Class members and/or purchases by Tennessee residents;

(z)    Utah Code §§13-11-1, *et seq.*, with respect to purchases in Utah by Class members and/or purchases by Utah residents;

(aa)   Va. Code §§59.1-196, *et seq.*, with respect to purchases in Virginia by Class members and/or purchases by Virginia residents;

(bb)   Vt. Stat Ann. 9, §2453, *et seq.*, with respect to purchases in Vermont by Class members and/or purchases by Vermont residents; and

(cc)   W. Va. Code §46A-6-102, *et seq.*, with respect to purchases in West Virginia by Class members and/or purchases by West Virginia residents.

146.   Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive conduct. Their injury consists of paying higher prices for pesticides containing the Relevant AIs than they would have paid in the absence of these violations. This injury is of the type that state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct. On behalf of themselves and the Class, Plaintiffs seek all appropriate relief provided for under the foregoing statutes.

## COUNT V
## UNJUST ENRICHMENT

147.   Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

148.   Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense. For example, Plaintiffs and Class Members paid

37

supracompetitive prices for pesticides containing the Relevant AIs. Defendants' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to overpayments for pesticides containing the Relevant AIs.

149. Defendants unjustly retained those benefits at the expense of Plaintiffs and Class members because Defendants' conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and the Class.

150. The benefits that Defendants derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

151. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds they received, and such other relief as the Court may deem just and proper.

## VII.    PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the Class, respectfully request judgment against Defendants as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives, that Plaintiffs' counsel of record be appointed as Class counsel, and that the Court direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2, the

listed unfair competition laws, state consumer protection laws, and common law, and, in the alternative, the listed state antitrust laws;

D. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged in the Complaint, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect under Section 16 of the Clayton Antitrust Act, 16 U.S.C. §26;

E. That the Court award Plaintiffs and the Class damages against Defendants for their violations of federal and state antitrust laws, in an amount to be trebled under §4 of the Clayton Antitrust Act, 15 U.S.C. §15, plus interest;

F. That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

G. That the Court award Plaintiffs and the Class pre- and post-judgment interest as provided by law and that such interest be awarded at the maximum rate allowable by law from and after the date of service of this Complaint; and

H. That the Court direct such other and further relief as the case may require and the Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: January 16, 2023 **LAW OFFICE OF ALFRED G. YATES, JR., P.C.**

*/s/ Alfred G. Yates, Jr.*

Alfred G. Yates, Jr. (PA17419)
Gerald L. Rutledge (PA62027)
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
Telephone: (412) 391-5164
Facsimile: (412) 471-1033
yateslaw@aol.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo
Erin G. Comite
Michelle Conston
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Telephone: (212) 223-6444
jguglielmo@scott-scott.com
ecomite@scott-scott.com
mconston@scott-scott.com